IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LORI A. EMERY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 13-cv-1329-DRH-CJP |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Lori A. Emery seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in November, 2010, alleging disability beginning on August 25, 2010. (Tr. 11). After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application in a written decision dated September 19, 2012. (Tr. 11-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in his assessment of plaintiff's migraine headaches.

2. The ALJ ignored medical evidence favorable to plaintiff, causing him to understate the severity of her cervical disc disease, vertigo/dizziness and tremors of the extremities.

3. The ALJ's credibility determination was erroneous.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C.

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

§423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work

experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Emery was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th **Cir.**

1996)(citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not worked since the alleged onset date. She was insured for DIB through March 31, 2014.[2] He found that plaintiff had severe impairments of obesity, chronic renal failure, spinal disorder, right plantar fasciitis, left foot sinus tarsi syndrome with gastrocnemius contracture, peripheral neuropathy, fibromyalgia, cephalgia, blindness of the left eye, anxiety, and pain disorder.[3] He further determined that plaintiff's impairments do not meet or equal

---

[2] The date last insured is relevant to the claim for DIB only.

[3] Sinus tarsi syndrome is a "[c]linical disorder characterized by specific symptoms and signs localized to the sinus tarsi (known as the "eye of the foot"), which refers to an opening on the outside of the foot between the ankle and heel bone." Website of the American Academy of Podiatric Sports Medicine, http://www.aapsm.org/sinus_tarsi_syndrome.html, accessed on November 14, 2014.

a listed impairment.

The ALJ found that Ms. Emery had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.   Agency Forms

Plaintiff was born in 1967, and was almost 43 years old on the alleged onset date. (Tr. 205). In November, 2010, she was 5'4" tall and weighed 171 pounds. (Tr. 209). She alleged disability due to a number of conditions, including cranial bleed, migraines, anxiety and depression, and degenerative disc disease. (Tr. 209).

Plaintiff had worked in the past as a coordinator for government housing, a reservation sales associate and a service desk associate. She has a high school education. (Tr. 210).

6

Plaintiff submitted a Function Report in December, 2010. In the December 2010 Function Report she stated she lived with her 11 year old son. She further stated that she did very little on a regular basis. She had migraine headaches, dizzy spells and blurred vision. She had weakness and tremors in her legs and arms. She was unable to sit or stand for long and had extreme fatigue. She tried to keep up with light housework and laundry, but usually needed help. It was becoming increasingly difficult to do household chores. Just walking around the grocery store wore her out. (Tr. 217-229).

2.  **Evidentiary Hearing**

In August 2012, plaintiff was represented by an attorney at the evidentiary hearing. (Tr. 32).

At the evidentiary hearing, plaintiff testified that she lived with her 17 year old daughter[4] and 13 year old son. Her son has cystic fibrosis and was on SSI. She had a medical card. She stopped working in August, 2010, because of fatigue, headaches, weakness and tingling in her arms and legs, and muscle pain. (Tr. 36-37). Her children helped her with the housework. (Tr. 48). Her father helped with the yard work. (Tr. 47).

Ms. Emery had a cranial bleed in early 2008. Since then, she had migraine headaches which had gotten worse over the last 6 to 8 months. She had 3 or 4 migraines a week. The pain lasted from 4 hours to 2 days. She had been to the

---

[4] There is no mention of the plaintiff's daughter or where the plaintiff's daughter resided in the December 2010 Function Report.

7

emergency room for migraines on occasion. She took Imitrex, but it did not help. She also took Norco and Zofran for nausea. She had to lay down with a pillow over her head. (Tr. 39-41). She had vertigo when she got up in the morning and when she bent over. She suffered from fatigue. (Tr. 42). She had tremors in her hands and feet. (Tr. 47).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to only occasional stooping, frequent balancing, frequent overhead reaching and handling with both extremities, and frequent fine manipulation with the right hand. She should avoid even moderate exposure to unprotected heights and dangerous machinery. She should work in an environment with only moderate noise intensity, no sustained direct sunlight and no concentrated exposure to vibration. She was limited to work involving rote or routine instructions for 2-hour work segments, and could not perform complex or detailed tasks. The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are envelope stuffer, sedentary inspector/tester, and system surveillance monitor. (Tr. 55-58).

### 3. Medical Treatment

Ms. Emery had a cranial bleed caused by a venous angioma of her right brain

8

in 2008. (Tr. 420).

Plaintiff was treated for neck pain by Dr. Sonjay Fonn, a neurosurgeon, in 2009 and 2010. He administered epidural steroid injections at C5-6. On July 29, 2010, Dr. Fonn noted that an MRI showed broad based disc herniation at C5-6. (Tr. 304-307).

Dr. Craig Furry, a primary care physician, treated plaintiff in 2010 and 2011. He saw her on October 25, 2010, the alleged date of onset of disability. She reported that she had been having shaking and numbness in her legs for the past few days. On exam, he detected tremor in the legs and the left arm against resistance. Because of her history of a cranial bleed, he ordered an MRI of the brain. (Tr. 399). The MRI showed no evidence of an acute infarct, but she did have T2 hyperintense foci which were described as nonspecific. The radiologist suggested that "[d]iagnostic considerations include sequela of migraine headaches, minimal chronic microvascular ischemic change, [and] vasculitis among others." (Tr. 324-325).

In November, 2010, Dr. Furry again detected tremor of the left arm and legs after 15 seconds of resistance. Plaintiff told him that she had intermittent shaking and weakness, and frequent blurred vision. She wanted to try Topamax for migraines, as Bupap did not help. (Tr. 398). Dr. Furry again detected tremors in December, 2010. She reported severe fatigue, migraines 2 to 3 times a week and vertigo with change of position. Dr. Furry indicated he would try to get her a

9

referral to a neurologist. (Tr. 394). She again complained of fatigue, tremors and migraines in May, 2011. Dr. Furry again found tremors in the extremities after resistance. He also diagnosed depression and prescribed Zoloft. He recommended a referral for an MS evaluation. (Tr. 393).

Dr. Adrian Feinerman performed a consultative physical examination on April 15, 2011. Plaintiff said that she had back and neck pain, headaches and dizziness. She also said that she had been diagnosed with fibromyalgia and that she hurt everywhere. His exam was normal except that she was legally blind in the left eye and had limited range of motion of the shoulders and lumbar spine. He did not note any tremors. An x-ray of the cervical spine showed mild-moderate degenerative changes at C5-6. (Tr. 367-379).

Fred Klug, Ph.D., performed a consultative psychological examination on May 5, 2011. He found that her attention span was adequate and concentration was good. Her immediate memory was impaired and short-term memory was poor. Long-term memory was intact. Reasoning, abstract thinking, insight and judgment were all poor. Her thought processes were goal-directed and relevant. Her affect was appropriate and her mood was euthymic. He diagnosed pain disorder associated with psychological factors and a medical condition. (Tr. 382-385).

On Dr. Furry's referral, Ms. Emery was evaluated by a neurologist, Dr. Mellies, to rule out MS in July, 2011. He concluded that she did not have MS. He

did not detect tremors on exam. Sensation to pinprick was intact in the arms and legs. He concluded that some her of complaints could be attributed to fibromyalgia, but "the possibility of anxiety and depression cannot be excluded." (Tr. 407-408).

Plaintiff saw her primary care physician for refills of medications in January, 2012. She was taking hydrocodone for migraines and fibromyalgia. She had tried Topamax. She had also tried a number of other medications, including Cymbalta, Lexapro and Effexor, but "nothing worked." The doctor recommended an evaluation with a psychiatrist for anxiety and depression. (Tr. 480).

In February, 2012, primary care physician Michael Workman, M.D., noted that Ms. Emery was having migraines 3 to 4 times a week and was being treated by Dr. Mellies. She was seeing a counselor for anxiety. She complained of fatigue, trembling and palpitations, and left foot pain. (Tr. 438-441). In March, 2012, plaintiff told Dr. Workman she was having increased tremors and bad migraines. On exam, he noted a "small intent tremor" of the left upper extremity. (Tr. 433-435). On March 16, 2012, Dr. Workman found "some tremor" in the left hand. (Tr. 430). On April 2, 2012, she complained to Dr. Workman of increased dizziness and headaches. She had taken Antivert in the past. She was seeing a counselor, who evidently recommended a mood stabilizer. He prescribed Antivert, to be taken as needed. (Tr. 425-427).

The last office note from Dr. Workman is dated May 16, 2012. Ms. Emery

11

again complained of dizziness and migraines. She was taking a number of medications, including Imitrex, Norco and Antivert. She had no tremor. Dr. Workman wrote that he had instructed the patient more than once to follow up with her neurologist, but she "keeps stating hard to get [to] cape."[5] (Tr. 419-421).

Ms. Emery saw Dr. Mellies on June 5, 2012. She told him she was still having headaches and dizziness, and her headaches were worse since her last visit in the summer of 2011. She had tried Topamax, with no benefit, and Gabapentin caused too much drowsiness. She was taking Imitrex and Hydrocodone. She said that Maxalt had worked, but Illinois Public Aid would not cover it. He suggested that she try Depakote and return in 2 months. (Tr. 552).

## Analysis

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). This rule is long-standing. See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), and cases cited therein.

Here, ALJ Janney ignored evidence which supports plaintiff's claim.

The ALJ believed Ms. Emery's claim that she had migraine headaches, but he concluded that "the record does not support the frequency or intensity of headaches

---

[5] Dr. Mellies' office was located in Cape Girardeau, Missouri.

12

alleged." He based this conclusion on several factors. First, there was no documentation of her alleged emergency room visits for migraines. Second, she said she took narcotic prescriptions for migraines, but he believed that the record showed that the narcotic prescriptions were for fibromyalgia. Third, "she alleged the cranial bleed as a primary cause of disability," but the bleed occurred in 2008, and she was able to work in 2008 and 2009 at the level of substantial gainful activity. Lastly, he believed that the record showed "little treatment on an acute basis" and showed improvement of her migraines with treatment. (Tr. 19).

The ALJ is correct about the lack of emergency room records. The other factors enumerated by him are not supported by the record. The observation about narcotic prescriptions is somewhat puzzling in that the record reflects that Ms. Emery was prescribed a number of medications for migraines, including Maxalt, Topamax, Imitrex, and Propranolol. Further, the records of both Dr. Workman and Dr. Mellies indicate she was taking Hydrocodone, a narcotic drug, for migraines in May and June, 2012. The ALJ's reliance on the timing of the cranial bleed is off-base. Ms. Emery testified that she had migraine headaches since the cranial bleed, but they had gotten worse. The medical records reflect ongoing complaints that her migraines were getting worse in frequency and intensity. The fact that she was still able to work in 2009 does not disprove that her migraines were getting worse in 2010 and 2011. And, the ALJ's conclusion that her migraines had gotten better with treatment ignores substantial parts of the

13

medical records. The records of both the primary care physicians and the neurologist reflect that the doctors repeatedly changed her migraine medications in search of one which would give her relief. As far as the record reflects, the only really effective medication, Maxalt, was not covered by Illinois Public Aid and was therefore unavailable to her. In sum, the ALJ's evaluation of the severity of Ms. Emery's migraine headaches was not supported by the record.

A related problem is the ALJ's attempt to account for plaintiff's migraine headaches in his assessment of her RFC. He limited her to environments with a moderate noise intensity or lower, no sustained direct sunlight and no concentrated exposure to vibration. At the hearing, he indicated that these limitations were related to her headaches. See, Tr. 57. However, there is no medical evidence to support the idea that her migraines were triggered or exacerbated by noise, bright lights or vibration. The Commissioner argues that the ALJ is responsible for weighing the evidence and drawing appropriate inferences from the record, citing *Seamon v. Astrue*, 364 Fed. Appx. 243, 247 (7th Cir. 2010). That case is inapposite. In *Seamon*, the RFC assessment was based upon the ALJ's weighing of medical opinions, not, as here, on his own lay interpretation of the medical evidence. The present case is more akin to *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), in which the Seventh Circuit held that the ALJ erred in relying upon her own lay interpretation of an MRI report.

The Commissioner suggests that any error in assessing plaintiff's headaches

was harmless.  Doc. 26, p. 6.  The Court disagrees.  An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be."  *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).  In *McKinzey*, the ALJ erred in not discussing the opinion of a state agency physician.  However, the Seventh Circuit held that the error was harmless because "no reasonable ALJ would reach a contrary decision on remand" based on that opinion.  *McKinzey, Ibid*.  Here, the Court cannot conclude that an ALJ who properly assessed the evidence regarding plaintiff's migraines would conclude that she was not disabled.

    The Court also agrees that the ALJ overlooked significant evidence in evaluating Ms. Emery's tremors.  The ALJ stated twice that there was only one notation of small essential intent tremor in the medical records.  (Tr. 14, 16).  In fact, both Dr. Furry and Dr. Workman detected tremors on several visits, as described in the review of the medical evidence above.  The Commissioner argues that the ALJ's failure to characterize tremors as a "severe impairment" is of no consequence because that was only a threshold determination.  Doc. 26, p. 4.  This argument fails to appreciate the substance of plaintiff's point.  The ALJ relied heavily on his perception that plaintiff's complaints were not supported by the medical evidence in assessing both her credibility and her RFC.  The problem is that the ALJ failed to recognize medical evidence that supported her complaints.  In a similar vein, the ALJ stated that plaintiff had only mild cervical disc disease

15

(Tr. 14), while ignoring the 2010 MRI which showed broad based disc herniation at C5-6.

Plaintiff's point regarding the credibility analysis is also well-taken. It is true that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ's credibility analysis rested in large part on his perception that the medical evidence did not support plaintiff's allegations. That analysis is obviously undermined by the ALJ's selective review of the medical evidence.

The Commissioner's defense of this case is perfunctory. She argues that the evidence cited by plaintiff does not show that she has limitations more severe than those assessed by the ALJ. Doc. 23, p. 6. This argument misses the mark. The ALJ's selective review of the medical evidence undermines his findings as to plaintiff's credibility and his ultimate findings as to plaintiff's RFC. See, *Moore*, 743 F.3d at 1122-1127. The ALJ is not permitted to "cherry-pick" the evidence,

16

ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

ALJ Janney failed to build the required logical bridge from the evidence to his conclusions. See, *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). He erred in presenting only a "skewed version of the evidence." *Moore*, 743 F.3d at 1123. As a result, his decision is lacking in evidentiary support and must be remanded. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Emery was disabled at the relevant time or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Lori A. Emery's application for social security disability benefits is **REVERSED** and **REMANDED** to the

17

Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

Signed this 22nd day of November, 2014.

David R. Herndon
2014.11.22
06:31:58 -06'00'

**United States District Judge**

18